UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**NORRIS N. CALHOUN,**

    Plaintiff,

                       Case No. 4:08cv409-SPM/WCS

**FLORIDA STATE HOSPITAL,**

    Defendant.

_____/

## DEFENDANT, FLORIDA STATE HOSPITAL'S, MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Defendant, Florida State Hospital (FSH), pursuant to Fed. R. Civ. P. 56 and N.D. Fla. Loc. R. 56.1, moves for the entry of final summary judgment against Plaintiff, Norris N. Calhoun, and states:

### FACTUAL BACKGROUND

1. Plaintiff has filed a Title VII complaint against FSH, alleging unlawful disparate treatment based on his gender.

2. Plaintiff, a Unit Treatment Rehabilitative Specialist (UTRS)[1] in the male forensic units of FSH, alleges that he and other male employees[2] were "designated to perform particularly difficult and unpleasant tasks" which his female counterparts were

---

[1] A UTRS is a direct care or "floor worker" employee whose primary duty it is to personally attend to the forensic patients at FSH.

[2] The complaint does not purport to be a class action.

not required to perform. Plaintiff's specific complaint is that, on four occasions[3] during the time period of July, 2007 – June, 2008, the medical staff of FSH entered gender-specific orders, requiring that only male staff provide 1:1 special attendance[4] to particular male forensic residents of FSH.

3. FSH, located in Chattahoochee, Florida, is a state mental health facility operated by Florida Department of Children and Families. FSH is an in-patient/residential facility. FSH houses both forensic residents (those admitted from the corrections or criminal justice systems) and civilly committed residents (generally, Baker Act patients).

4. The forensic residents at FSH have all been charged with felony offenses and have been adjudicated either incompetent to proceed with trial or other judicial proceedings (ITP), or not guilty by reason of insanity (NGI). The great majority of FSH's forensic patients are ITP, as were all four of the residents at issue in this lawsuit.

5. Each defendant who is committed to FSH has been evaluated by a community psychologist or psychiatrist and, after an evidentiary hearing, judicially determined to be suffering from an Axis I mental illness as defined by the <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th Edition, commonly referred to as the DSM-IV. Axis I mental illnesses include schizophrenia, paranoia, bipolar disorder,

---

[3] Plaintiff's complaint addresses only three such orders, but in his deposition Plaintiff identified a fourth order. At issue are "male staff only" orders entered once each for residents VR, BE, RY, and HB.

[4] A 1:1 special means that, for any of a variety of reasons, clinical staff at FSH have ordered a one to one staff ratio for a particular resident, and the attendant must stay within arm's reach of the resident at all times.

disassociative disorders, sexual and gender identity disorders, impulse control disorders, delirium and depression. Many of these defendants are also sociopaths, having a dual, Axis II diagnosis of personality or anti-social disorder. They also very frequently have complicating medical and social histories and low global functioning scores. In other words, each forensic patient at FSH has a unique and often complex mix of factors which may impact his or her behaviors, and individualized clinical judgment is required for each instance of subsequent diagnosis and treatment. In addition to the immediately apparent behaviors at the time of such a decision, a resident's history and early diagnoses are important factors in determining the clinically appropriate response to any particular behavior.

5. Three of the four residents at issue in this lawsuit, VR, BE, and RY, were attended by Dr. Sandra Raheb, a board certified psychiatrist, who works in Unit 23 of FSH, one of the two male forensic admissions units at the hospital. On single occasions for each of the three residents, Dr. Raheb determined, in her best clinical judgment, that it was therapeutically necessary for these male residents to be monitored via a 1:1 special, and that the attendants should be male. In her opinion, the close proximity of female staff members to these residents at the times in question would have exacerbated their condition and/or posed a safety concerns for the female staff. The history, diagnoses, and earlier behaviors of these residents, as more particularly described in FSH's statement of undisputed facts, were factors in the exercise of her professional judgment.

6. The other resident at issue in this lawsuit, HB, was attended by nurse practitioner Cecilia Matthews, who was assigned to work in Unit 21 of FSH, a less secure, male "step down" unit. On the date in question, HB was caught with contraband,

and an emergency meeting with his treatment team was convened to collaboratively address the appropriate therapeutic response. Ms. Matthews was part of that team and, as the senior medical staff member in the unit at the time, had the ultimate responsibility of writing the appropriate order. When personally addressing HB, Ms. Matthews found his presentation to be sexually provocative and intimidating, and female staff members expressed concern to her that HB would react in a sexually aggressive fashion if female staff were assigned to "special" him. Ms. Matthews determined, in her best clinical judgment, that it was therapeutically necessary for this male resident to be monitored via a 1:1 special, and that the attendant should be male. In her opinion, the close proximity of female staff members to HB at the time in question would have exacerbated his condition and/or pose a safety concerns for the female staff.

7.  In each of the four scenarios, Dr. Raheb's and Ms. Matthew's professional judgment about the best means of deescalating the residents' problematic behaviors appears to have been successfully borne out, as each of the four residents thereafter reacted in a reasonably calm and well-behaved fashion for the duration of their "male staff only" 1:1 specials.

8.  Although the medical charts for these residents often lack notations to confirm Plaintiff's provision of these gender specific services to the residents, he recalls doing so. He cannot remember the number of times he provided to the 1:1 specials, and he concedes that his assignments could have lasted for as little time as a part of an eight hour shift. In fact, he acknowledges that if he had attended a resident for a full eight hour shift, he would have made notations in the chart; thus, where there are no notations, he must have undertaken the 1:1 for less than a full shift.

9. Despite the allegation in his complaint that he was required to "perform particularly difficult and unpleasant tasks" by providing this gender specific attendance to the residents, Plaintiff does not complain that the residents in question were ill-behaved or difficult to deal with while he was attending them. On the contrary, he points to the residents' calm behavior as evidence that the gender specific orders were the result of discriminatory animus rather than a form of mental health treatment. Thus, Plaintiff's sole allegation of discrimination is that the use of "male staff only" orders is *per se* discriminatory.

10. While Plaintiff steadfastly disputes FSH's position that the orders were entered for legitimate clinical reasons, Plaintiff admits that he has no medical training or credentials; concedes that he is not qualified to diagnose or treat mental illnesses; was not present when the medical staff dealt directly with the residents at issue; was not personally consulted by the medical staff prior to the issuance of the gender specific orders; and has no expert testimony to challenge the legitimacy of Dr. Raheb and ARNP Matthews' clinical judgment.

11. Plaintiff readily concedes that staffing 1:1 specials is a very common and routine part of his and every UTRS' job responsibilities. In the absence of gender specific orders, staff assignments for 1:1 specials are made on a rotating basis, so that no one staff member is required to perform this particular task disproportionately. Male and female staff members routinely perform 1:1 specials for the residents in Units 23 and 21.

12. Plaintiff has repeatedly testified that if he had provided the 1:1 special staffing to residents VR, BE, RY, and HB pursuant to a random or rotating system of

assignment, he would have had no qualms whatsoever in performing this task for these residents.

13. The only "adverse employment action" asserted by Plaintiff is that while the "male staff only" orders are in place, it can be occasionally difficult to take a break at the usual time, since another male staff member must relieve the attendant; and he recalls having to take lunch late (at approximately 2 o'clock) on one occasion.

## BASIS FOR SUMMARY JUDGMENT

14. On these facts, FSH is entitled to summary judgment for two separate and distinct reasons:

(a) Plaintiff's complaint fails as a matter of law because he has not articulated any cognizable adverse employment action. He therefore fails to establish a prima facie case of employment discrimination.

(b) Plaintiff's complaint fails as a matter of law because he cannot produce any evidence to suggest that Dr. Raheb and Ms. Matthews' testimony that the gender specific orders were clinically necessary and entered in their best professional judgment, is a mere pretext for discriminatory intent.

15. The pleadings, depositions, and affidavits filed in support of this motion, demonstrate that there is no genuine issue as to any material fact, and that FSH is entitled to judgment as a matter of law.

## MEMORANDUM OF LAW

### I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure, mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. The moving party is entitled to summary judgment where there is no genuine issue of material fact. Fed.R.Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Plaintiff has no direct evidence of such alleged discrimination. Therefore, to establish a prima facie case of gender discrimination based on circumstantial evidence, Plaintiff must invoke the burden-shifting framework set forth in McDonnell Douglas, and show (1) he belongs to a protected class; (2) he was qualified to do the job; (3) he was subjected to adverse employment action; and (4) his employer treated similarly situated employees outside her class more favorably. Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003).

II.  **PLAINTIFF'S ALLEGATIONS OF DISPARATE TREATMENT DO NOT RISE TO THE LEVEL OF AN ADVERSE EMPLOYMENT ACTION**

Not all conduct by an employer negatively affecting an employee constitutes adverse employment action; rather, an adverse employment action constitutes an objectively material change in employment conditions, such as hiring, firing, failing to promote, or a significant change in benefits. Butler v. Ala. Dept. of Transp., 536 F.3d 1209 (11th Cir. 2008); Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001). Although the courts have declined to establish a bright line rule quantifying the level of materiality required to support an assertion of adverse employment action, it is well-established that "Title VII is neither a general civility code nor a statute making actionable the 'ordinary tribulations of the workplace.' " Davis v. Town of Lake Park at 1238, *citing,* Gupta v.Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000), *cert.*

*denied,* 531 U.S. 1076, 121 S.Ct. 772, 148 L.Ed.2d 671 (2001) (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir.1999)). As the Eleventh Circuit in Davis explained:

> Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

Id. at 1239.

This Court has addressed the requisite seriousness of alleged adverse employment action in terms of a "threshold level of substantiality." *See, e.g.,* Wooten v. Board of Trustees, Florida A & M University, 426 F. Supp. 2d at 1261 (N.D. Fla. 2006), wherein the plaintiff asserted race discrimination and retaliation and alleged, among other "adverse employment actions," certain non-financial burdens such as being required to sign a 3 month contract instead of a 12 month contract, and having to get her supervisor's approval before making new hires. In rejecting Plaintiff's claims, the Court opined as follows: "By whatever name known, there is a required threshold level of substantiality that a Title VII plaintiff must meet. When the effects are nonfinancial, the requirement is for race- or retaliation-based conditions that, considered in their entirety, are 'severe or pervasive.' Dr. Wooten's allegations do not come close." Id. Just as clearly, Mr. Calhoun's allegations "do not come close." The sole adverse impact of the allegedly

discriminatory staffing assignments was occasional delay in taking a break, occasioned by the necessity of another male staff member substituting for him, and a single incident of having to wait until 2:00 for lunch.

Indeed, Mr. Calhoun's gender-specific assignment to 1:1 specials with the residents of the forensic units of FSH was not a change in the terms and conditions of his employment *at all*, much less a serious or material change. He has repeatedly testify that it is a routine and very common requirement of his job to provide 1:1 specials to these residents, and that is what he was required to do in the four incidents in question. The Eleventh Circuit has dispositively addressed such allegations in <u>Butler v. Alabama Dept. of Transp.</u>, 536 F. 3d 1209 (11th Cir. 2008), in which the African-American plaintiff complained of race discrimination and asserted, among other things, that she was required to perform manual labor in her job when a white counter-part was not. In the face of Butler's acknowledgment that her job description included doing some manual labor on job sites, the Court opined that

> [n]one of the remaining things about which Butler complains, even taken collectively, constitutes "serious and material change in the terms, conditions, or privileges of employment." The job position that Butler held required her to perform some manual labor; she does not contend otherwise. Nor does she contend that ever changed. As an engineering assistant, Butler's responsibilities included: performing field tests of soil, concrete, asphalt, and other materials; maintaining construction equipment and vehicles; operating that equipment; and performing engineering tasks. At trial, Butler testified that the "manual labor" she performed consisted of making concrete cylinders, running compaction tests, drawing cross sections, and taking measurements. None of those activities is outside the job description of an engineering assistant whose duties included monitoring road, highway, and bridge construction and performing the necessary tests and tasks required to do so. Butler does not argue to the contrary. ***Requiring an employee to perform her job is not a change in the terms, conditions, or privileges of her employment.***

Id. at 1215 (internal citation omitted; emphasis supplied).

The Southern District of Florida similarly opined in Zedeck v. Target Corp., 2008 WL 2225661 (S. D. Fla. May 29, 2008), where the plaintiff complained that being required to remove a necklace amounted to unlawful discrimination based on his religion, despite the existence of a company-wide policy generally prohibiting the wearing of jewelry:

> [R]ather than a "serious and material change" in the terms and conditions of employment, the policy prohibiting Plaintiff from wearing jewelry was itself a term of his employment. . . . The order enforcing the same is likewise not a change in the terms and conditions of employment, but rather an enforcement of the existing terms of employment.

Id. at *5.

In summary, Mr. Calhoun has not only completely failed to allege any materially adverse impact on the terms and conditions of his employment, he has failed to allege any impact *at all*. He protests being assigned to particular 1:1 specials of the residents, but readily admits that all UTRSs, male and female alike, routinely perform this same task as part of the responsibilities of their position. As the Eleventh Circuit made clear in Butler, supra., it cannot be a violation of Title VII for an employer to simply require an employee to do his job.

### III.   THERE IS NO EVIDENCE OF PRETEXT

Plaintiff's claim for disparate treatment additionally fails because he cannot show that FSH's proffered reasons for acting were a mere pretext for discrimination. Once a plaintiff establishes a prima facie case, the burden shifts to the employer to simply articulate a legitimate business reason for its employment action. If the employer meets this burden, the plaintiff must show that the stated reasons are pretextual. Springer v.

Convergys Customer Management Group, Inc., 509 F.3d 1344, 1347 (11th Cir. 2007). The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. Id. Moreover, the plaintiff has the burden of convincing the fact finder "both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). That is, "[i]t is not enough ... to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination." Id. at 519.

FSH has articulated a non-discriminatory reason for its gender-specific assignments: the clinical judgment of Dr. Raheb and ARNP Matthews was that "male staff only" orders for these four residents were both therapeutically necessary and a reasonable safety precaution for the staff. Plaintiff has not and cannot offer any evidence to create a genuine issue of material fact regarding whether these medical decisions were a mere pretext for discriminatory animus. While Mr. Calhoun and witness Kin Sheffield opine, based on their experience as direct care workers, that the orders were not put in place for the purpose of treatment, they are admittedly unqualified to make such pronouncements. They readily concede that they have no credentials which would lend support to their beliefs and that they cannot diagnose or treat mental illnesses. Contrasted with this concession is undisputed testimony that, with the rare exception of gender-specific orders, FSH is a gender-neutral workplace in all respects; that Dr. Raheb and Ms. Matthews have worked as psychiatric professionals among this mentally ill population for many years and are unquestionably qualified to render clinical decisions about treatment and diagnoses; that while hundreds of residents could have cycled through the units in question during the 12 months under scrutiny, only four orders are at issue; and

that Ms. Matthews has also found it medically necessary, on occasion, to enter "female staff only" orders for 1:1 specials on female residents.

In general, and especially absent countervailing expert testimony, neither the Plaintiff nor the Court has a basis for second-guessing the treatment modalities utilized on a case-by-case basis by the mental health professionals at FSH. The deference to be accorded to the clinical judgment of FSH's medical staff has been long-established in the analogous circumstance of decisions to restrain mental health patients when medically necessary. In Youngberg v. Romeo, 457 U.S. 307, 319-22 (1982), the Supreme Court held that mental health patients have a protected liberty interest in being free from unwarranted restraint, and that the decision whether to restrain a patient should be left to professional medical judgment. "It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Id. at 321. The restraint decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from acceptable professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." Id. at 323. Long-term treatment decisions "normally should be made by persons with degrees in medicine or nursing" or other appropriate training, and are "entitled to a presumption of correctness." Id. at 323-24 n. 30. See also, Thomas S. v. Flaherty, 699 F. Supp 1178 (W.D.N.C. 1988) (mentally retarded adults had a constitutional right to treatment comporting with the judgment of qualified professionals, and the decision [to treat a certain way], if made by a professional, is presumptively valid).

Plaintiff's unsupported but persistent accusation of discriminatory intent cannot sustain his claims. *See, e.g.*, Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081 (11th Cir.1990) (holding that "[m]ere conclusory allegations and assertions will not suffice" to establish pretext). To the contrary, to survive summary judgment, the plaintiff must present ***concrete evidence*** in the form of ***specific facts*** which show that the defendant's proffered reason is mere pretext. Id.; *see also*, Wallace v. Teledyne Continental Motors, 138 Fed. Appx. 139, 2005 WL 1052563 (11th Cir. 2005); Robinson v. Alutiq-Mele, LLC, 2008 WL 1836370 *1 (S.D. Fla. 2008).

## CONCLUSION

During the course of a twelve month period of time, pursuant to valid treatment orders which he is incompetent to challenge, Mr. Calhoun was required to do what he routinely does while on the job: provide 1:1 staffing to male residents, albeit pursuant to gender-specific directive instead of the normal rotational assignment. He cannot remember how long he "specialed" these residents but does recall that they gave him no trouble whatsoever. The adversity attributed by Plaintiff to this employment action is the possibility of delayed breaks and having to wait until 2:00 one day to eat his lunch. As held by Judge Hinkle in the Wooten case, supra., the Plaintiff's allegations "do not [even] come close." FSH is entitled to judgment as a matter of law.

WHEREFORE, the Defendant, Florida State Hospital, respectfully requests the Court to enter final summary judgment in its favor and against the Plaintiff, Norris N. Calhoun.

HENRY, BUCHANAN, HUDSON
SUBER & CARTER, P.A.


/s/ Laura Beth Faragasso
LAURA BETH FARAGASSO
Florida Bar No. 654604
lbfaragasso@henryblaw.com
CARRIE MENDRICK ROANE
Florida Bar No. 0192491
croane@henryblaw.com
Post Office Box 14079
Tallahassee, Florida  32317-4079
(850) 222-2920: Telephone
(850) 224-0034: Facsimile

Attorneys for Defendant,
*Florida State Hospital*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was electronically filed with the Court via the CM/ECF filing system, and delivered to the Plaintiff via First Class U.S. Mail, postage prepaid, at 6295 Hartsfield Road, Greenwood, FL 32443, this 2nd day of July, 2009.

/s/ Laura Beth Faragasso