**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**NORRIS NEAL CALHOUN,**

      **Plaintiff,**

**vs.**                           **Case No. 4:08cv409-SPM/WCS**

**FLORIDA STATE HOSPITAL,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

Defendant filed a motion for summary judgment, doc. 32, supported by a statement of facts, doc. 33, and several affidavits, docs. 34-36, and other evidence, docs. 37-41, 43-44. Plaintiff, who is *pro se* in this employment discrimination action, filed a response on July 20, 2009, doc. 45, in accordance with the initial scheduling order, doc. 13. Since Plaintiff represents himself, another order was entered explaining in greater detail his obligation to respond under FED. R. CIV. P. 56 and N.D. Fla. Loc. R. 56.1. *See* doc. 46. Plaintiff has chosen to rely on his initial response as no supplement has been filed by the deadline provided.

**Allegations of the Complaint, doc. 1**

Plaintiff alleged that he was subject to discrimination by his employer, the Florida State Hospital, on the basis of his gender and age. Doc. 1, p. 3. Plaintiff reports that as

a male nurse, he is "designated to perform particularly difficult and unpleasant tasks" which are not required of the female employees in Plaintiff's job capacity. *Id.*, at 4. Plaintiff alleges that on certain occasions, doctors have written orders for "male staff only." *Id.* Plaintiff alleges those orders are discriminatory.

**Standard of Review**

On a motion for summary judgment Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If accomplished, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id.* An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986). All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts. Scott v. Harris, 550 U.S. 372, 380, 127

S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* Ricci v. DeStefano, 2009 WL 1835138, 18, 129 S.Ct. 2658, (June 29, 2009). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Industrial Co., 475 U.S. at 587 (internal quotation marks omitted), *quoted in* Ricci v. DeStefano, 2009 WL 1835138, 18, 129 S.Ct.2658, 2677 (June 29, 2009).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

Local Rule 56.1(A) provides that a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion." The Local Rule also provides that the statement "shall reference the appropriate deposition, affidavit, interrogatory, admission, or other source of the relied upon material fact, by page, paragraph, number, or other detail sufficient to permit the court to readily locate and

check the source."  The Local Rule provides that the party opposing the motion shall serve a similar statement of material facts as to which the party contends there is a genuine issue to be tried, using the same format.  Facts set forth in Defendants' statement will be deemed admitted (if supported by the record evidence) unless controverted by Plaintiff's statement.

**The relevant Rule 56(e) evidence**

Plaintiff has worked at the Florida State Hospital (FSH) since approximately 1990 in various capacities.  Doc. 33, p. 1.  FSH is a "state mental health facility" which houses both forensic and civilly committed residents.  Doc. 33, p. 2; Jackson affidavit (doc. 36), p. 2.[1]  Plaintiff began his employment at FSH following high school, beginning in the janitorial department, and eventually working his way up.  Calhoun deposition, doc. 37, p. 4.  During the times relevant to this action, Plaintiff was employed as a Unit Treatment Rehabilitation Specialist (UTRS) in Units 21 and 23.  Doc. 33, p. 1; Calhoun deposition, p. 7.  Plaintiff was trained at the hospital to work as a UTRS, but Plaintiff is not qualified "to undertake the diagnosis or treatment of medical or psychological illnesses."  Doc. 33, p. 2; Calhoun deposition, pp. 7, 17.

Ms. Cecilia Matthews is a registered nurse, with a Masters degree in nursing and she is also licensed as a nurse practitioner.  Doc. 33, p. 2; Matthews affidavit (doc. 34).  Ms. Matthews works in Unit 21 at FSH.  Matthews affidavit.  She wrote one of the "male staff only" orders challenged in this case, referred to as a "1:1 special" order for a

---

[1] After the first reference to an affidavit and its docket number, affidavits will simply be referenced by affidavit.

resident in Unit 21. Doc. 33, p. 2; Matthews affidavit. The "1:1" designation requires a "one to one staff ratio for a particular resident, and the attendant must stay within arm's reach of the resident at all times." Doc. 33, p. 2, n.1. Dr. Sandra Raheb is a board certified psychiatrist who wrote three additional "male staff only" orders for several residents in unit 23. Doc. 33, pp. 2-3.

FSH houses "approximately 1,000 in-patient mental health residents." Doc. 33, p. 3. "On average, approximately 800 of these 1,000 residents are forensic commitments." *Id.*, *see* Jackson affidavit (doc. 36), ¶ 5. Forensic patients are admitted pursuant to court orders and arrive from either county jails or the Florida Department of Corrections. Doc. 33, p. 3; Jackson affidavit, ¶ 6. "All defendants referred to FSH have been charged with felony offenses." Doc. 33, p. 3, *citing* FLA. STAT. § 916.105(1); Jackson affidavit, ¶ 7. Incoming residents have either been "adjudicated incompetent to proceed (ITP) with his or her trial or other judicial proceeding (such as a sentencing or violation of probation hearing); or has been tried on charges and found not guilty by reason of insanity (NGI)." *Id.*, *citing* FLA. STAT. § 916.105(1); Jackson affidavit, ¶ 8.

All four of the residents who are at issue in this case were adjudicated incompetent to proceed. Doc. 33, p. 4; Matthews affidavit, ¶ 5; Jackson affidavit, ¶ 9. Court orders entered to commit an ITP defendant follow examinations by "one or more community evaluators" in which the individual is diagnosed as having "an Axis I mental illness . . . ." Doc. 33, p. 4; Jackson affidavit, ¶ 10. "Axis I mental illnesses include schizophrenia, paranoia, bipolar disorder, disassociative disorders, sexual and gender identity disorders, impulse control disorders, delirium and depression." Doc. 33, pp. 4-5;

Raheb affidavit, ¶ 6.  "In addition to an Axis I mental illness, many defendants also have an Axis II personality or anti-social disorder diagnosis" such as a "failure to conform to social norms; deceitfulness; impulsivity or failure to plan ahead; irritability and aggressiveness; reckless disregard for the safety of self or others; consistent irresponsibility; and lack of remorse," and may have other complicating medical issues as well such as hypertension, obesity, and the like.  Doc. 33, p. 5; Raheb affidavit, ¶ 6.  "There is a constant influx of new residents and discharge of those who have been restored to competency, which results in an ever-changing forensic population."  Doc. 33, p. 5; Jackson affidavit, ¶13.  The complex mix of clinical and social factors requires "a great deal of clinical judgment" to address an individual's situation.  Raheb affidavit, ¶ 7.

Unit 23 is one of two admissions units for male forensic patients.  Doc. 33, p. 5; Jackson affidavit, ¶ 14.  The admissions units, which sits behind secure fencing and razor wire, are "the most secure and restrictive residential units at FSH."  Doc. 33, p. 6; Jackson affidavit, ¶ 15.  Unit 23 has four wards, each housing 25 residents, for a unit maximum capacity of 100 residents.  Doc. 33, p. 6; Calhoun deposition, p. 8.  Unit 21 is a "step-down" male forensic unit at FSH.  Doc. 33, p. 6; Jackson affidavit, ¶ 16.  The Unit 21 residents have "progressed beyond the need for the tightest possible security, but their competency has not yet been restored to the point of returning to the correctional system or release to the community."  *Id.*; Jackson affidavit, ¶ 16.

A variety of staff are employed at FSH.  "Human Services Workers (HSW) and Unit Treatment Rehabilitation Specialists (UTRS) are the forensic units' 'floor workers.' "

Doc. 33, p. 6; Jackson affidavit, ¶ 17. These staff "provide hands-on, direct patient care and personal services to the residents." Doc. 33, p. 6; Jackson affidavit, ¶ 17. It is a "routine and very common responsibility of a UTRS" to provide "1:1 or 2:1 'specials' for the residents." Doc. 33, p. 6; Jackson affidavit, ¶ 27. Both male and female employees fill UTRS positions and did so along with Plaintiff during all times relevant to this lawsuit. Doc. 33, p. 7; Calhoun deposition, p. 14; Jackson affidavit, ¶ 23. "All UTRS staff members receive the same training, have the same job responsibilities, and are expected to perform the same tasks unless a gender-specific order is given by the medical staff vis-à-vis a particular resident." Doc. 33, p. 7; Jackson affidavit, ¶ 23; Calhoun affidavit, p. 19. Work assignments for UTRS staff in Unit 23 are "gender neutral" in that female staff perform the same work as male staff members. Doc. 33, p. 7; Calhoun deposition, p. 14.

Medical staff at the forensic units includes nurses, nurse practitioners, psychologists, and psychiatrists. Doc. 33, p. 8; Jackson affidavit, ¶ 19. Medical staff work one-on-one with residents and also as part of teams, variously known as service teams, treatment teams, or recovery teams. Doc. 33, p. 8; Jackson affidavit, ¶ 20. Each resident is assigned to a treatment team, consisting of the resident, a direct care worker, a nurse, a resident's advocate, a social worker, a qualified mental health professional, a psychologist, and a psychiatrist. Doc. 33, p. 8; Jackson affidavit, ¶ 21. The team evaluates the psychological, medical, and social profile of each resident, and provides treatment "in the most therapeutic fashion possible, in accordance with the team's best clinical judgment." Doc. 33, pp. 8-9; Jackson affidavit, ¶ 22.

The practice at FSH is to use the "least restrictive measures possible, commensurate with the particular resident's clinical needs and the safety of other residents and the staff" when treating psychological instability or inappropriate behavior. Doc. 33, p. 9; Jackson affidavit, ¶ 24. Each treatment plan varies from by resident and circumstances. Doc. 33, p. 9; Jackson affidavit, ¶ 25. When dealing with escalating behaviors or the resident "is clinically decompensating, FSH's progressive model of intervention is utilized." Doc. 33, p. 9; Jackson affidavit, ¶ 26. Such progression entails restriction of movement and special visual observations, which range from Level A status through Level C status. Doc. 33, pp. 9-10; Jackson affidavit, ¶ 26. Level A "means a staff member must personally check on [a resident] every 15 minutes." Doc. 33, p. 9; Jackson affidavit, ¶ 26. Level B, close visual observation requires the resident to never be "out of the line of vision of a staff member, and there are no physical barriers between the resident and staff member." Doc. 33, pp. 9-10; Jackson affidavit, ¶ 26. Level C observation requires one or two staff members to "remain within arm's length of the resident at all times (1:1 special or 2:1 special)." Doc. 33, p. 10; Jackson affidavit, ¶ 26. "If the behaviors continue to escalate into violence, security can be called to assist with the resident, and special orders for the use of restraint or seclusion can be administered." Jackson affidavit, ¶ 26; doc. 33, p. 10; Calhoun deposition. Treatment for residents may also entail "medication changes, counseling, and the issuance of gender-specific staffing orders where close proximity of one gender or the other is likely to exacerbate the resident's condition." Doc. 33, p. 10; Calhoun deposition; Jackson affidavit, ¶ 28.

"Direct care staff do not have the authority to countermand or ignore a gender specific order entered by a member of the medical staff."  Doc. 33, p. 10; Jackson affidavit, ¶ 29.  "At times, it is clinically appropriate to enter gender-specific staffing orders for both male and female residents."  *Id.*, at 10; Raheb deposition; Matthews deposition.  A gender-specific order, referred to by Plaintiff as "specialing," requires "one-on-one observation" and watching a resident "within arm's reach."  Calhoun deposition, p. 16.

Direct-care staff, "both male and female, are assigned on a rotating basis to perform 1:1 specials for a resident" if there is no "gender-specific directive."  Doc. 33, p. 11; Calhoun deposition, 37.  Female co-workers of Plaintiff "provided 1:1 special care to" residents "when gender-specific directives were not in place, as well as to other male residents as a routine part of their jobs."  Doc. 33, pp. 11-12; Calhoun deposition, p. 37.

There were four specific instances of "male staff only" orders at issue in this case: (1) on July 31, 2007; (2) on August 5, 2007; (3) on August 17, 2007; and (4) on June 27, 2008.  *See* doc. 1, pp. 4-5.  Each of those orders concerned a different resident patient, identified only by the patient's initials.  Calhoun deposition, p. 16.

Resident VR was admitted to FSH on his second ITP (adjudicated incompetent to proceed) admission in May of 2007.  Doc. 33, p. 12; Raheb affidavit; ¶ 8.  VR had been "charged with first degree murder, having slashed the throat of his girlfriend in a public theater and then attempted suicide himself."  Doc. 33, p. 12; Raheb affidavit.  "VR was diagnosed with schizoaffective disorder, bipolar type, with cocaine and cannabis dependency in a controlled environment."  *Id.*  "VR articulated an intention to rape a

female staff member whom he remembered from his prior admission and expressed to Dr. Raheb that voices had told him to kill his girlfriend." *Id.* VR "was sexually preoccupied, soliciting sex from the female staff, preoccupied about thoughts of outer space, traveling to other worlds, and [Dr. Raheb] thought he was at above average risk for suicide, and homicide, and aggression, and self injuries [sic] behavior, and elopement, and was not socializing well with other patients." Raheb deposition, p. 6. Initially, VR "refused medications and was put on an emergency treatment order." Doc. 33, p. 12; Raheb affidavit; ¶ 8. He reported that he continued to hear voices "and made comments about sexual fantasies, including having sexual intercourse with dead bodies, and made repeated comments to female staff of an inappropriate sexual nature." *Id.*; *see also* Raheb deposition (doc. 41), p. 4. VR targeted a particular female staff member, commenting about her perfume. Raheb affidavit, ¶ 8. Additionally, during June of 2007, VR "exhibited violent tendencies, throwing a chair and cracking a plexiglass window and physically assaulting a security guard." *Id.* VR had also "physically assaulted a security officer with injury." Raheb deposition, pp. 3-4. For the safety of VR and other residents, he had "to be placed in restraints and in seclusion for a period of time." Raheb affidavit, ¶ 8.

Following those events, and as a "step down" measure from seclusion, Dr. Raheb issued a "male staff only" 1:1 order for VR on July 31, 2007. Doc. 33, p. 13; Raheb affidavit, ¶ 9; Raheb deposition, p. 3; Plaintiff's ex. A (doc. 45-2, p. 2). Dr. Raheb entered the order because she found VR's condition had improved somewhat so that he could be released from seclusion and restraint, but Dr. Raheb felt "that 1:1 staffing

proximity was necessary for both the welfare of the patient and other residents." Doc. 33, p. 13; Raheb affidavit, ¶ 9. Dr. Raheb's clinical judgment, considering VR's past history and current psychiatric condition, was that his "psychosis would have been exacerbated by the presence of a female staff member within arm's reach of him," making it unsafe for VR and the staff member. Doc. 33, p. 13; Raheb affidavit. Dr. Raheb was "very, very afraid of to let [sic] this man be within arm's length of a woman alone, you know." Raheb deposition, p. 3. VR had "been commenting about the perfume of a specific female staff, and, you know, it looked like he was getting his fantasies worked up again." *Id.*, at 4. Dr. Raheb had "reason to believe that he might be specifically lethal towards women and in a way that he wouldn't be towards men" due to his "kind of psychosis . . . ." *Id.* In Dr. Raheb's opinion, a male staff member's close proximity would not exacerbate VR's condition. Doc. 33, p. 13; Raheb affidavit. Plaintiff provided the gender specific 1:1 staffing on VR on August 2, 4, and 5, and he was "calm, cooperative, ate well, socialized well, and presented no behavioral or clinical problems. Doc. 33, p. 13; Calhoun deposition, pp. 19-20. Plaintiff acknowledged in his deposition that VR gave him no trouble whatsoever. Doc. 33, p. 14; Calhoun deposition, pp. 19-20, 22.

Resident BE was admitted to FSH on his third ITP admission in August of 2004. Doc. 33, p. 14; Raheb affidavit, ¶ 11. BE was a long-term resident and was diagnosed with "schizoaffective disorder, bipolar type, with a history of polysubstance abuse and a borderline personality disorder." *Id.* BE had difficulty with impulse control, had expressed an intent to commit suicide and, while in "step-down" Unit 23, had

"threatened to kill all female staff, declaring that he had a shank with which to carry out his threats." *Id.,* at ¶¶ 12-13; *see also* Raheb deposition, p. 6.  On June 27, 2007, BE had pushed down a pregnant staff member.  Raheb affidavit, ¶¶ 12-13.  He "refused to take his medications, prompting an emergency treatment order." *Id.*  In July of 2007, he was "on one to one special for threatening to kill female employees."  Raheb deposition, p. 9.

On September 5, 2007, following another "series of expressions of desire to commit suicide, Dr. Raheb issued a 'male staff only' 1:1 special order for BE."  Doc. 33, p. 14; Raheb affidavit, ¶ 14; *see* Plaintiff's ex. E (doc. 45-2, p. 7).  In her opinion, BE was decompensating, "and both his pre-admission history and his targeted verbal and physical attacks on female staff warranted the gender specific order on that day."  Doc. 33, pp. 14-15; Raheb affidavit.  The 1:1 male only staff order lasted until September 7th when the gender restriction was lifted.  Doc. 33, p. 15; Raheb affidavit, ¶ 15.  There are no progress notes by Plaintiff in BE's medical chart on those days, but Plaintiff remembers "specialing" BE at some point during September 5th and 7th for less than a full shift.  Doc. 33, p. 15; Calhoun deposition, p. 24.  Plaintiff does not recall any troublesome or difficult behavior from BE, and the only impact from the work assignment was "difficulty taking a break and having to eat lunch at 2:00."  Doc. 33, p. 15; Calhoun deposition, p. 26.

Resident RY was admitted to FSH as an ITP resident on July 16, 2007.  Doc. 33, p. 15; Raheb affidavit, ¶ 16.  RY had several criminal charges pending against him, including one for indecent exposure.  *Id.*  RY was diagnosed with "schizoaffective

disorder, bipolar type, and had a cocaine dependency." *Id.* During the early portion of

his detention in Unit 23, RY "was sexually inappropriate with numerous female staff

members, aggressive, manipulative, and easily agitated when confronted." Doc. 33, pp.

15-16; Raheb affidavit, ¶ 17. RY also "began following a female member of the

housekeeping staff so closely that she could not do her work." *Id.* On August 17, 2007,

after the complaint was received about RY "stalking the housekeeper, he was noted as

being hypersexual and aggressive and was ordered into a jumpsuit as a therapeutic

means of controlling his masturbation." Doc. 33, p. 16; Raheb affidavit, ¶ 18.

RY refused increased medications and he "monopolized the residents' telephone

while masturbating," which also prompted an "emergency treatment order." Doc. 33, p.

16; Raheb affidavit, ¶ 17. Dr. Raheb entered a "male staff only:" 1:1 order for RY,

"along with the requirement that he wear a jumpsuit, on August 17, 2007." Doc. 33, p.

16; Raheb affidavit, ¶ 17; *see* Plaintiff's ex. H (doc. 45-2, p. 15).

Plaintiff submitted an exhibit which contains progress notes about RY. Plaintiff's

Ex. J (doc. 45-2, p. 17-19). The notes detail the actions of RY and explain that he "has

been sexually inappropriate on numerous occasions with female staff" and was abusive,

hostile and threatening . . . ." Plaintiff's Ex. J (doc. 45-2, p. 18). The records note how

he was following housekeeping, "monopolized the telephones while masturbating," and

showing other aggressive and "psychotic symptoms." *Id.* RY's medical chart does not

reflect progress notes by Plaintiff, but Plaintiff remembers "specialing" RY at some point

between August 17th and August 23rd. Calhoun deposition, p. 29. Plaintiff does not

recall how many times he was assigned to RY, whether he was off duty for some of that

time, or whether his assignment lasted for a full shift or less than a full shift.  Doc. 33, p. 16; Calhoun deposition, p. 29.  Plaintiff also could not recall that RY displayed any problematic behavior while Plaintiff was specialing him.  Calhoun deposition, p. 30.

Resident HB was admitted to Unit 23 of FSH as an ITP admission on November 28, 2007.  Doc. 33, p. 17; Matthews affidavit, p. 1.  HB had fourteen "criminal charges pending, including two for second degree murder, armed robbery, and a variety of drug charges."  *Id.*  "HB was diagnosed with major depressive disorder, severe with psychotic features, polysubstance dependence in a controlled environment, and borderline intellectual functioning."  *Id.*

HB was transferred to Unit 21 in January, 2008, but on June 27, 2008, he was caught with contraband sent to him in a package from an outside source.  Doc. 33, p. 17; Matthews affidavit, pp. 1-2; *see also* Matthews deposition, p. 3.  "The incident occurred late on a Friday after the staff psychologists and psychiatrists had gone home."  Matthews affidavit, p. 2.  An emergency meeting of HB's treatment team was convened, Ms. Matthews included, to decide what to do.  *Id.*  Female staff members were concerned "that HB would act out sexually in their presence."  *Id.*  When Ms. Matthews addressed HB herself, she found him "to be sexually inappropriate, provocative, and intimidating."  *Id.*  During her deposition, Ms. Matthews described HB's "presentation" of himself:

> He was very – I mean, he came in with his pants almost off of him, down to his waist, his whole underwear was hangin[g] out.  He was very provocative and very intimidating in his presentation, very sexually inappropriate, the way he was in his mannerisms and just the way he was acting, you know . . . .

Matthews deposition, p. 4. The consensus of the treatment team was "that a gender-specific staffing order was appropriate for HB." *Id.* Ms. Matthews entered the "male staff only" 1:1 order because she was the "senior member of the medical staff then on duty." *Id.* In her "clinical judgment, having a female staff member in close proximity might trigger sexually aggressive behavior, whereas having a male attendant was less likely to trigger such a response." *Id.* Ms. Matthews believed the order would therapeutically benefit HB while also protecting female staff members. Doc. 33, pp. 17-18; Matthews affidavit, p. 2. Ms. Matthews did not feel that male staff were able to do anything that female staff could not do, only that "female staff might trigger some of those [sexually provocative] tendencies" and having a male staff member with him "might help keep things under control" until he could be transferred. Matthews deposition, p. 4.

HB was transferred from Unit 21 back to the more secure setting of Unit 23 that same evening. Doc. 33, p. 18; Matthews affidavit, p. 2. Plaintiff was assigned to accompany HB during the transfer, along with a security officer. Doc. 33, p. 18; Calhoun deposition, p. 32. Plaintiff believes he was only with HB for an hour or two before HB was transferred out of Unit 21 and Plaintiff did not experience any difficult behavior from HB. *Id.*

In summary, Plaintiff acknowledged in his deposition that none of the four residents gave him any trouble during the time he was assigned to them pursuant to the 1:1 gender-specific orders. Doc. 33, p. 18; Calhoun deposition, *supra.* The sole adverse impact upon his employment was that it was occasionally difficult to take lunch

breaks because only a male staff member could relieve him. *Id.*, p. 19; Calhoun

deposition, p. 101-102. Plaintiff also acknowledged that female staff carried out the

same "specialing" orders which are routinely randomly assigned. Calhoun deposition,

pp. 16, 33-34. Plaintiff does not have a problem carrying out the one-on-one

"specialing" orders when assigned randomly, but Plaintiff contends there was no

treatment need for "male only orders." Calhoun deposition, pp. 16-17, 33. Finally, Dr.

Raheb testified that each patient is considered independently, that the individual and his

past history are considered when making treatment decisions, and that female-only

orders might be entered if needed:

> Now, if - if we were to have a patient who felt that he had to kill men
> specifically and not women for some specific reason or had a history of –
> Well, just for example, . . . if there were a - if this was a man who had a
> history of killing his male lovers and were targeting men specifically and
> not women, we might, you know, then we would be concerned in a
> different way.

Raheb deposition, pp. 4-5. She explained that male staff are called upon in certain

instances to monitor a patient because the male staff "might be at less risk of . . .

exciting the pathology of the patient." *Id.*, at 5. The "male-only" orders are written to

avoid exacerbating a patient's behavior and also "protect people that have been

specifically targeted." *Id.* Ms. Matthews testified in her deposition that there had been

occasions where she wrote "female staff only orders or felt that those would be

appropriate." Matthews deposition, p. 5.

**Analysis**

Title VII prohibits employers from discriminating against "any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Plaintiff's claim of gender discrimination is based on a theory of disparate treatment in the workplace.  Such a claim may be established by either direct evidence, that is evidence which proves the existence of a fact without inference or presumption, or indirect, circumstantial evidence.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004), *citing* Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999); Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997).

Here, there is no direct evidence of gender discrimination; thus, to evaluate Plaintiff's claim, the *McDonnell Douglas* framework is employed.  A plaintiff must establish a *prima facie* case of disparate treatment by showing he "was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class."  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  If Plaintiff establishes a *prima facie* case, thus, creating the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002); Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).  "If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and

the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." Wilson, 376 F.3d at 1087, *citing* Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 255-256, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981).

Plaintiff's complaint did articulate a *prima facie* case by pointing to the issuance of "male-only" staff orders. On their face, gender-specific orders raise an inference of discrimination.

Thus, the burden shifted to Defendant to articulate a legitimate reason for the male only orders. They have done so. The evidence establishes that the orders were entered based on the medical needs of a particular forensic mental patient, with considerations for the safety of staff and other residents. Trained medical and psychological staff determined in each instance that one-one-one supervision was necessary for the particular patient due to that patient's particular psychological needs. Trained staff determined that having direct care staff of the opposite gender just an arm's length away from the patient would be detrimental to the patient's progress, and could lead to violent outbursts or sexual assault. Medical staff also found that limiting the opportunities for the patient to react violently against females would protect staff and even other female residents. These orders were issued by trained medical staff, who fully considered the psychological needs of residents as well as their criminal history and past conduct. Plaintiff is a direct care worker and has no medical training. His personal opinions about a particular patient's possible actions and psychological state cannot override the opinions of trained medical professionals. The staff at FSH

provided a basis for the treatment ordered deemed appropriate for the particular patient, considered the safety of staff and residents and have provided a legitimate, non-discriminatory reason for entering a gender-specific order.[2]

Plaintiff has not shown that the legitimate reasons articulated by Defendant are a pretext for discrimination. He has not done so.

Plaintiff points out that the orders did not document the behaviors in support of the treatment ordered. Doc. 45, pp. 3-4. The lack of detail is not evidence of improper discrimination. This is not a case where the patient claims that his or her legal rights were infringed without justification. The orders were carried out by non-medical staff who did not need to understand the medical necessity for the order. Further, treatment staff need to spend time treating and supervising, not writing dissertations to explain every treatment or supervisory decision. Moreover, the patients have privacy interests, and keeping the details out of the order respects that privacy concern. Finally, Plaintiff lacks any formal medical training and he is not qualified to second-guess a doctor's orders.

Indeed, considering that both male and female employees carry out "1:1 special" orders requiring close and constant supervision of a resident, it is not discrimination that

---

[2] While an employer may make decisions on the basis of gender when gender presents a "bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise," 42 U.S.C. § 2000e-2(e), this is not such a case. *See* doc. 45, p. 4. Construed liberally, Plaintiff has argued there was no business necessity for a male only staff order. *Id.* However, the UTRS job positions themselves were not limited to males only, but the positions were filled by men and women. Furthermore, Defendant has shown there was a business necessity for the orders to facilitate mental health treatment and maintain safety to all persons in the unit.

at times an order may direct only male or only female supervision. There is evidence that orders are written for female only and male only supervision. There is no discrimination when both genders carry out identical orders.

For these reasons, summary judgment should be entered for Defendant. There is no evidence of discrimination based upon Plaintiff's gender or age.

Alternatively, Plaintiff also has failed to show any "adverse employment action." The Supreme Court "defined an adverse employment action as follows: 'A tangible employment action constitutes significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits.' " Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), *quoted in* Webb-Edwards v. Orange County Sheriff's Office, 525 F.3d 1013, 1031 (11th Cir. 2008). The Eleventh Circuit has further explained that "to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (finding "not all conduct by an employer negatively affecting an employee constitutes adverse employment action."), *quoted in* Webb-Edwards, 525 F.3d at 1031. "Moreover, the employee's subjective view of the significant adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Davis, 245 F.3d at 1239, *quoted in* Webb-Edwards, 525 F.3d at 1031.

The "male-only" staff orders for one on one observations cannot be considered an adverse action.  Despite Plaintiff's argument that "male employees were designated to perform particularly difficult and unpleasant tasks" not required of female employees, doc. 45, pp. 1-2, Plaintiff testified that he had no problems with residents conducting one on one supervision pursuant to the orders.  The only adversity he identified is that it was sometimes difficult to take a break because he would need to be relieved by another male staff member.  Further, other males were required to comply with such orders, and females might be issued such an order should the need arise.  Therefore, as Defendant points out, the orders were "not a change in the terms and conditions of [Plaintiff's] employment *at all*, must less a serious or material change."  Doc. 32, p. 9.  A routine part of one's employment cannot be challenged as an adverse action as it does not materially change any term or condition of employment.  "Requiring an employee to perform her job is not a change in the terms, conditions, or privileges of her employment."  Butler v. Alabama Dept. of Transp., 536 F.3d 1209, 1215 (11th Cir. 2008).

**RECOMMENDATION**

Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment, doc. 32, be **GRANTED**, and judgment entered in Defendant's favor.

**IN CHAMBERS** at Tallahassee, Florida, on October 29, 2009.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.